IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **David Sparks,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | No. 25-cv_____ |
| | : | |
| **City of Philadelphia, Donald Marano,** | : | **Jury Trial Demanded** |
| **James Sloan, Crystal Williams, Aisha** | : | |
| **Perry, John Verrecchio, Det. Mostovyk,** | : | |
| **Dominic Mangoni, Joseph Bamberski,** | : | |
| **John Newcomb, Levi Morton, Stephen** | : | |
| **Grace, Robert Hassel, Michael Acerenza,** | : | |
| **Melvin Williams,** | : | |
| | : | |
| **Defendants.** | : | |

**COMPLAINT**

## I.    Preliminary Statement

1.      This action is based on the extraordinary misconduct of detectives in the
Philadelphia Police Department's Homicide Division whose actions led to the wrongful arrest,
prosecution, conviction, and incarceration of plaintiff David Sparks for a murder he did not
commit. As a result of that misconduct, Sparks spent more than 17 years in prison.

2.      On September 4, 2006 at around 11:30 pm, Gary Hall was shot and killed on
Wingohocking Street in the Nicetown neighborhood of Philadelphia at the end of a Labor Day
block party.

3.      Numerous people witnessed the shooting, and it became common knowledge in
the neighborhood that a young man named Ivan Simmons was the person who shot Hall after
Hall had argued with Simmons's brother.

4.      However, rather than arrest Simmons, the defendant detectives pursued a prosecution against David Sparks, a then 16-year-old boy who was one of many community members present during the shooting. Sparks had nothing to do with the shooting.

5.      The defendant detectives detained Sparks shortly after the shooting and held him in custody throughout the night while they collected three unreliable and fabricated statements to build a case against him.

6.      As an initial step, the defendant detectives obtained facially unreliable, inconsistent, and inaccurate statements made by two young girls—12 and 14-years-old—neither of whom could actually identify the shooter, and both of whom were close family friends with Hall.

7.      Knowing that the two children were not credible witnesses, the defendant detectives then proceeded to obtain a fabricated and coerced signed statement from Barry McShore, a local community member, pinning the shooting on Sparks. McShore immediately disclaimed the statement and later testified that police invented the statement out of whole cloth and coerced him to sign it.

8.      Despite the dozens of eyewitnesses available to be interviewed and the information they obtained at the scene about Simmons's involvement, detectives used these three statements to convince the Philadelphia District Attorney's Office ("DAO") to charge Sparks with murder the next day without further investigation.

9.      While Sparks was awaiting trial, the defendant detectives spent the next year and a half investigating a series of retaliatory shootings set into motion by Hall's death, including the shooting death of Ivan Simmons, the person who had killed Hall. Through those investigations,

the defendant detectives received repeated confirmation of what they had learned shortly after the Hall murder: that Simmons killed Hall and Sparks was innocent.

10.     Rather than informing the DAO they had the wrong person and Sparks should be released, the defendant detectives instead buried the evidence pointing to Simmons and proceeded with the false, contrived case against Sparks.

11.     In line with established practices and customs of the Philadelphia Police Department ("PPD") Homicide Division, the defendant detectives recorded the evidence revealing the true perpetrator, Simmons, on handwritten notes, because they knew the notes would not be produced to the DAO.

12.     As a result, Sparks was convicted and sentenced to life in prison at 18-years-old.

13.     For the next 15 years, Sparks fought to overturn his wrongful conviction, collecting numerous eyewitness statements confirming his innocence. However, it was not until 2022 when the DAO began producing PPD files to Sparks's post-conviction counsel regarding the murder of Ivan Simmons, the true perpetrator of the Hall murder, that Sparks was able to prove that defendant detectives knew he was innocent all along and had hidden the evidence demonstrating his innocence.

14.     Lawyers in the DAO's Conviction Integrity Unit ("CIU") then began to review the case and produced to Sparks several more PPD homicide investigation files, including the Hall homicide investigation file, revealing yet more evidence—that the defendant detectives had known about since 2006—demonstrating Simmons had killed Hall.

15.     Based on the avalanche of withheld, exculpatory evidence, the prosecution conceded that Sparks was entitled to post-conviction relief.

16.    On November 6, 2023, a judge in the Philadelphia Court of Common Pleas vacated Sparks's conviction and granted the prosecution's request to nolle pros all charges.

17.    Sparks was released from prison at age 34 after more than 17 years of wrongful imprisonment.

18.    Sparks's conviction for a crime he did not commit was the direct result of the defendant detectives' fabrication of evidence, malicious prosecution, and suppression of exculpatory information. As seen in multiple other cases involving exonerations of people convicted of murders they did not commit, these actions were the natural product of the City of Philadelphia's long historic practice of failing to train, supervise, and discipline detectives in the PPD Homicide Division to comply with clearly established constitutional obligations and the City's acquiescence to established customs of improper police practices.

19.    Sparks brings this civil rights action under 42 U.S.C. § 1983 and supplemental state law claims under Pennsylvania law seeking accountability for the violation of his constitutional rights and substantial harms and losses he suffered.

## II.    Jurisdiction and Venue

20.    This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

21.    Venue is proper in this Court as the incidents at issue in this matter occurred within the Eastern District of Pennsylvania.

## III.    Parties

22.    Plaintiff David Sparks, age 35, was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania.

23.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual defendants.

24.     Defendant Donald J. Marano, Badge No. 831, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

25.     Defendant James Sloan, Badge No. 891, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

26.     Defendant Crystal Williams, Badge No. 8051, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. She is sued in her individual capacity.

27.     Defendant Aisha Perry, Badge No. 79, was at all times relevant to this Complaint a lieutenant in the Philadelphia Police Department. She is sued in her individual capacity.

28.     Defendant John Verrecchio, Badge No. 609, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

29.     Defendant Mostovyk, Badge No. 739, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

30.     Defendant Dominic Mangoni, Badge No. 642, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

31.    Defendant Bamberski, Badge No. 9302, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

32.    Defendant John Newcomb, Badge No. 336, was at all times relevant to this Complaint a sergeant in the Philadelphia Police Department. He is sued in his individual capacity.

33.    Defendant Levi Morton, Badge No. 9138, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

34.    Defendant Stephen Grace, Badge No. 923, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

35.    Defendant Robert Hassel, Badge No. 8160, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

36.    Defendant Michael Acerenza, Badge No. 8153, was at all times relevant to this Complaint a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

37.    Defendant Melvin Williams, Badge No. 153, was at all times relevant to this Complaint a lieutenant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

38.    At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

39.     At all times relevant to this Complaint, all defendants acted under color of state law.

IV.    **Facts**

A.     **Gary Hall is shot and killed by Ivan Simmons in front of numerous witnesses.**

40.     On September 4, 2006, around 11:35 pm, Ivan Simmons shot and killed Gary Hall while Hall was riding a bicycle on Wingohocking Street in the Nicetown neighborhood of Philadelphia.

41.     The PPD Homicide Division assigned responsibility for the investigation of Hall's murder to Detective Donald Marano. Marano was aided in the investigation by Detectives Mosyovyk, James Sloan, Crystal Williams, John Verrechhio, Dominic Mangoni, and Joseph Bamberski. These detectives were supervised in their investigative activities by Sergeant John Newcomb and Lieutenant Melvin Williams. At the same time, Detectives Stephen Grace, Robert Hassel, Michael Acerenza, and Levi Morton were investigating several related homicides with common witnesses and suspects. These law enforcement officials are referred to below collectively as the "individual defendants" or "defendant detectives."

42.     To the extent any individual defendant did not directly participate in a specific portion of the Hall investigation, all defendants learned of the below-described investigative conduct based on their regular communications with the other individual defendants through the course of the Hall murder investigation and several other interconnected, contemporaneous murder investigations. Defendants shared information with one another across these several murder investigations, knowing they were related. As such, all defendants knew of or recklessly disregarded each other defendant's unlawful actions and inactions throughout the prosecution of

Sparks, yet they failed to act to prevent those actions and/or inactions from causing harm to Sparks.

43.     When Simmons shot Hall, there were dozens of people, somewhere between 50 and 100, in the street following a neighborhood Labor Day block party.

44.     Shortly before Hall was fatally shot, he was seen arguing with a boy named Marquis Lawrence. Lawrence was overheard asking Hall something to the effect of "weren't you supposed to go get a gun," to which Hall responded, "I'm not worried about you little boy" before getting on a bike and riding away.

45.     Lawrence's brother, Ivan Simmons, then walked into the middle of Wingohocking street behind Hall and shot him several times. Lawrence and Simmons immediately fled the scene.

46.     Many people saw Simmons shoot Hall and run from the scene, and word spread quickly that he was the perpetrator.

47.     Sparks was one of the many teenagers present at the time of the shooting. Unlike the perpetrators, Sparks did not flee. To the contrary, shortly after Hall was shot, Sparks called 911 to report the shooting to police and seek medical assistance for Hall.

48.     By the time police arrived on the scene, several of Hall's friends had taken him to the hospital.

49.     When police arrived, the scene was dark and chaotic, with children and adults from the neighborhood milling around and talking about the shooting.

50.     One of the supervising officers on the scene, Lieutenant Aisha Perry, gave direction to responding officers. Rather than instructing officers to create a comprehensive witness list and attempt to interview the many eyewitnesses about the shooting, Lieutenant Perry

ordered officers to conduct curfew checks on the teenagers present. As a result, in order to avoid citations or arrest, most of the underaged witnesses who were present and had information about the shooting left the scene.

**B.    Defendant detectives immediately focus their attention on David Sparks without any credible basis.**

51.    Sparks, who stayed on scene after calling the police for assistance, was stopped by Officer Dierdre Still. Still asked Sparks for his identification, which he did not have with him, so she detained him and began to prepare a citation for curfew violation.

52.    At around the same time as Officer Still detained Sparks, Detective James Sloan decided he would make Sparks a suspect in the shooting based on information he claimed to receive from an unknown witness.

53.    Sloan took custody of Sparks, told him he was a suspect, and brought him to the homicide division.

54.    Also at the scene, a woman named Karen Reddy, who was close friends with Hall's mother, told Sloan that her daughter had seen the shooting. Karen Reddy and her daughter Kalishea Reddy were then transported to the homicide division.

55.    Around 5:00 am, several hours after the shooting, Detective Marano interviewed 14-year-old Kalishea. Marano documented that Kalishea described seeing Hall arguing with Marquis Lawrence while Sparks was standing on the other side of the street. He also wrote that she stated that she then saw Sparks shooting at Hall, at which point she and her cousins ran into a Chinese restaurant to hide. After the shooting, the statement reported, Kalishea saw Sparks standing outside the restaurant.

56.    Marano also reported that Kalishea told him about what she claimed to have heard about the shooting from two of her cousins. First, according to Marano, Kalishea said that her

cousin Nakia had seen a teenager named Nicholas Walker getting into a black or blue car shortly after the shooting. Second, Marano reported that Kalishea claimed her cousin Markita told her she saw Ivan Simmons shooting at Hall.

57.     According to the statement, Kalishea named several other eyewitnesses and identified several photographs of individuals who were at the scene, including Simmons.

58.     A few hours later, Detectives Mangoni and Bamberski interviewed 12-year-old Markita Reddy, Kalishea's cousin. Mangoni and Bamberski claimed that Markita told them she was standing on the steps of the Chinese restaurant when she saw Lawrence and Hall arguing, Hall getting on a bike and riding away, and a boy in a white shirt shooting at Hall. After the shooting started, the detectives documented, Markita stated she went inside the Chinese restaurant and got on the ground with her cousins.

59.     The detectives also claimed that Markita identified a photograph of Sparks as the shooter.

60.     The statement attributed to Markita states, on the one hand, that Sparks was standing with Hall and Lawrence outside the Chinese restaurant while they argued and, on the other hand, that he was across the street in front of a different store. Mangoni and Bamberski did not address this inconsistency in the statement.

61.     Mangoni and Bamberski also did not reference in the statement any discussion with Markita about Simmons, nor did they show Markita a photograph of Simmons, despite the statement attributed to Kalishea just a few hours earlier reporting that Markita had told Kalishea she saw seeing Simmons shooting at Hall.

62.     Mangoni and Bamberski then interviewed 14-year-old Shania McPherson and her sister, 13-year-old Nakia Akins, cousins of Kalishea and Markita's who were also present during

10

the shooting. Both Akins and McPherson described a chaotic scene. McPherson stated that she did not see who was doing the shooting as she was inside the Chinese restaurant with her sister Nakia as well as Kalishea and Markita while the shooting occurred. Akins told the detectives that she saw the argument between Lawrence and Hall and provided minimal details about the shooter. The detectives did not show either of them photographs or ask them to identify Sparks or anyone else.

63.    This information from Akins and McPherson conclusively demonstrated the unreliability and inaccuracy of Kalishea and Markita's identifications of Sparks. Their statements placed Kalishea and Markita inside the Chinese restaurant when the shooting occurred, and, given the darkness at the time of the shooting, it would have been implausible for them to identify the shooter from inside the well-lit restaurant. Additionally, the fact that Sparks stayed on the scene, rather than fleeing with Lawrence, Simmons, and Walker conflicted with accounts that the perpetrator left immediately after the shooting.

64.    Based on the limited, inconsistent, and minimally informative interviews with two child witnesses, and without speaking to any of the numerous other people who had been present at the scene and observed the shooting, the defendant detectives decided that Sparks would be their suspect and that they would build a case against him. The detectives did so without developing any information about a motive or a connection between Sparks and Hall.

**C.    Defendants fabricate an additional witness statement to support their false allegations against Sparks and arrest him for murder.**

65.    Knowing that the unreliable statements of two children would not be sufficient to sustain a murder charge, the defendant detectives set out to fabricate an inculpatory statement attributed to an adult who had been on the scene, Barry McShore.

66.     Shortly after the shooting, McShore had spoken with Lieutenant Perry, whom he knew from prior interactions. McShore told Perry that he had not seen the shooting but that he heard two brothers were the perpetrators.

67.     This was consistent with information the police would soon receive, that Ivan Simmons shot Hall soon after Hall argued with Simmons's brother, Marquis Lawrence.

68.     McShore then pointed out Sparks, who was in police custody nearby on a curfew violation, stating to Perry: "that's the Sparks boy." Nothing about McShore's statement to Perry conveyed that he was identifying Sparks as someone who was involved in the shooting.

69.     While Perry was speaking with McShore, Sergeant John Newcomb joined the conversation and confirmed with McShore that McShore did not see the shooting and could not identify the perpetrator.

70.     McShore was then taken to the homicide division and told that he would need to make a short statement about what he heard at the scene and that he would then be released.

71.     When McShore arrived, the defendant detectives, without any legal basis, took McShore into custody at the homicide division.

72.     While McShore was detained, numerous detectives spoke with him, pressuring him to say that he had seen Sparks shoot Hall. McShore repeatedly told them this was false and that he did not witness the shooting and could not make an identification.

73.     More than 12 hours later, at around 11:30 am the morning after the shooting, Detectives Verrecchio and Mostovyk presented McShore with a fabricated, prewritten statement depicting a question-and-answer interview with McShore. The statement falsely claimed that McShore had witnessed the shooting and identified Sparks as the shooter.

74.     McShore never participated in such an interview and never gave such a statement. He had not witnessed the shooting, and he never believed or claimed that Sparks was the perpetrator.

75.     Verrecchio and Mostovyk made clear to McShore that he would not be permitted to leave the homicide division until he signed the false statement they had prepared for him. McShore, who was a crack cocaine user and had been drinking and using drugs throughout the previous day and had been held in custody overnight without access to drugs, agreed to sign the statement so he could go home.

76.     The defendant detectives decided to use the three statements they had obtained—two that were facially unreliable, uninvestigated, and inconsistent, and one that was entirely fabricated—to seek Sparks's arrest.

77.     On September 5, 2006, the day after the shooting, Lieutenant Melvin Williams spoke with a prosecutor in the DAO homicide unit to request approval for charges against Sparks. Williams presented to the prosecutor the statements obtained from Kalishea Reddy, Markita Reddy, and Barry McShore. Williams did not, however, inform the prosecutor about any of the following:

   a.  Evidence indicating Ivan Simmons was the actual perpetrator of the shooting, including information that Markita Reddy had told Kalishea Reddy that Simmons was shooting at Hall;

   b.  Evidence that Hall was arguing with Marquis Lawrence moments before Hall was shot, that Lawrence and Simmons were brothers, and that McShore had told Lieutenant Perry that he heard two brothers had done the shooting.

    c.   The defendant detectives unlawfully detained Barry McShore and had fabricated the statement attributed to him, falsely claiming that McShore saw the shooting and identified Sparks as the shooter; and

    d.   The defendant detectives only interviewed four teenage girls out of the dozens of eyewitnesses to the shooting, only asked two of those girls to identify photographs of suspects, and only asked Kalishea to view a photograph of Simmons.

78.    Led to believe a comprehensive investigation had taken place pointing to a singular suspect and without knowing this key exculpatory evidence, the prosecutor approved the charges against Sparks.

79.    The defendant detectives informed Sparks—who had been in custody since Detective Sloan arrested him on the scene—that he was under arrest for murder and that he would not be released.

**D.    The defendant detectives continue to receive and bury evidence of the true perpetrator.**

80.    Following Sparks's arrest on murder charges, the defendant detectives obtained further evidence demonstrating that Simmons killed Hall, that Sparks was innocent, and that many people at the scene witnessed the shooting and had information confirming these facts.

81.    Detectives requested a report documenting 911 calls made in the area of the shooting surrounding the time Hall was shot. One entry, made around midnight, after Sparks was already in custody, documents the caller observing "the doer" of the shooting driving at that moment in a gray car. This was inconsistent with Sparks's involvement as witnesses told police that Sparks was standing outside the Chinese restaurant immediately after the shooting occurred,

he was still on the scene around ten minutes after the shooting when he was detained by police, and he was in police custody at the time of the call.

82.     Undated handwritten notes placed in the Hall homicide investigation file ("H File") indicate that detectives spoke with several more witnesses following the shooting, including Tyrik Hood, Tyrell Hood, Latisha Lowry, and Sequoia Renee-Brown, none of whom was formally interviewed. Underneath the witnesses' names and phone numbers, detectives wrote that Simmons shot Hall, that Simmons was with "Nick," and that the gun was at Simmons's house on Cleveland Street.

83.     An additional undated handwritten note placed in the Hall H File includes another witness's name, Lakevia Parker, and states that Simmons was the shooter. This note also identified Simmons's getaway driver and another person who was with them, neither of whom was Sparks.

84.     Another handwritten note documents an undated interview with Thelma Thomas, who stated that she heard Simmons shot Hall over a drug dispute. Thomas also told detectives that Sequoia, a witness they had either already spoken with or of whom they were aware, had information as to Sparks's innocence.

**E.     The defendant detectives, intent on their prosecution of Sparks, fail to investigate extensive evidence pointing to Simmons.**

85.     In the early days of the investigation, the defendant detectives had obtained ample information pointing to Simmons as the true perpetrator, from both eyewitnesses and police officers who worked in the community. They also knew that there was only one shooter; ballistics analysis showed that one gun was used at the scene, and there was no viable theory that there were two shooters.

86.     With Sparks in custody on murder charges, the defendant detectives continued to receive information pointing to Simmons. On September 9, 2006, five days after the shooting, they met with Officer Kenneth Holmes who told them that people on the street were saying Simmons was involved in Hall's death.

87.     A few days later, on September 12, 2006, Detective Crystal Williams attempted to interview Simmons and his brother, Marquis Lawrence, who were both on juvenile probation at the time and had recently failed to report for a drug test. However, the two boys consulted with an attorney who advised them not to speak to police, and they declined to be interviewed.

88.     Despite the numerous tips suggesting Simmons and his brother's involvement, police documented no further efforts to speak with or investigate either suspect.

89.     Consistent with that inaction, detectives who had recovered a gun holster from the crime scene failed to test DNA found on the holster against Simmons's DNA. They did, however, seek to match the DNA with Sparks and Hall, both of whom were ruled out as contributors.

**F.      Simmons is killed, and the resulting investigation produces more evidence of Sparks's innocence of the Hall murder.**

90.     On November 30, 2006, Ivan Simmons was shot several times, and on December 12, 2006, he died from his injuries.

91.     Detectives Robert Hassel and Michael Acerenza of PPD's Northwest Detectives Division were initially assigned to investigate the case. After Simmons's death, Detective Levi Morton, of the homicide division took over the investigation and was assisted by Hassell and Acerenza.

92.     In investigating Simmons's murder, the defendant detectives obtained yet more evidence that Simmons had killed Hall and that he, in turn, was killed by Hall's associates in retaliation for Hall's murder.

93.     Hassel and Acerenza wrote a case summary document after Simmons was shot, but before he died, stating that the Simmons shooting was related to the Hall homicide investigation. They documented that they notified homicide detectives of the connection. Knowing the cases were connected, the detectives investigating the Simmons murder continued to share information they obtained throughout the investigation with the detectives assigned to the Hall murder.

94.     An undated handwritten note placed in the Simmons H File describing an interview with Simmons's mother documents a discussion about the Hall shooting, indicating that she told detectives she had heard her son was involved in that shooting.

95.     Shortly after Simmons's death, two other young men, Jameel Crum and Socrates Clark, were also shot, though they survived. The defendant detectives learned that these incidents were also part of the string of retaliatory shootings originating with Hall's death. They provided this information to the detectives investigating the Hall and Simmons murders and placed investigatory interviews conducted with Crum and Clark in the Simmons H File.

96.     During their December 27, 2006, interview of one of the shooting victims, Crum, Detectives Hassel and Acerenza took handwritten notes. The notes report that, according to Crum, Simmons was killed in retaliation for Hall's death. The notes also include a physical description of Nicholas Walker, the same associate of Simmons whom Kalishea Reddy told detectives she had seen getting into a car immediately after Hall's death. Hassel and Acrenza placed these interview notes in the Simmons H file.

97.     When Detective Stephen Grace took a formal statement from the other shooting victim, Socrates Clark, on January 15, 2007, Clark told Grace that the person who shot him was the same Nicholas Walker described by Kalishea Reddy. According to Clark, who was Gary Hall's cousin, Walker shot him in retaliation for the Simmons killing.

98.     Clark explained to Grace that his shooting was part of a series of retaliatory incidents: Simmons killed Hall, someone connected to Hall killed Simmons, so Walker (who was an associate of Simmons) tried to kill Clark because of his connection to the original victim, Hall.

99.     Grace placed this statement from Clark in the Simmons H file as well.

100.    On June 7, 2007, Detectives Grace and Hassel interviewed Walker—the associate of Simmons who had been observed at the scene of the Hall shooting and had been identified as the person who shot Socrates Clark—regarding yet another shooting of another young man named Hassan "Hock" Harrison. Walker confirmed for Grace and Hassel what the defendant detectives had known all along: that Simmons killed Hall.

101.    After the shooting of Hall, Walker explained, Harrison put out a hit on Walker and Simmons, offering money to anyone who killed them.

102.    Grace and Hassel were well aware of the relevance of this statement to the Hall murder investigation and the prosecution of Sparks due to their contemporaneous participation in the Simmons murder investigation.

**G.      The defendant detectives obtain additional evidence that Simmons killed Hall through the investigation of yet another murder.**

103.    The defendant detectives also became aware that Simmons was a lead suspect in another murder, of a man named Larres Curry, that took place a few days prior to Hall's murder.

Simmons's brother, Marquis Lawrence, and Nicholas Walker were also suspected of involvement in that murder.

104.    Detective Crystal Williams was assigned to investigate the Curry murder, and she was assisted by several of the same detectives investigating the Hall murder, including Detectives Marano and Bamberski, and Lieutenant Melvin Williams. All defendant detectives shared information with one another about these related investigations.

105.    Through investigating the Curry murder, the defendant detectives discovered and shared with one another yet more information indicating Simmons had killed Hall and that Sparks was innocent.

106.    The defendant detectives were well aware of the interconnectedness of the Simmons murder and the Curry murder. A notebook placed in the Simmons H File includes an undated handwritten note stating that Simmons was involved in both the Hall shooting and the Curry shooting. It also noted Marano and Crystal Williams as the respective assigned detectives to the two investigations.

107.    Ballistics analysis indicated that Curry and Hall were shot with the same gun.

108.    While overseeing the investigations of both the Hall and Curry murders, Lieutenant Melvin Williams received a message regarding a call from Lieutenant Perry who explained that Simmons shot and killed Hall and that Simmons's brother, Marquis Lawrence, shot Curry. The defendant detectives placed the summary of this call in the Curry H File.

109.    Detective Thomas Gaul wrote a note to Detectives Marano and Crystal Williams stating a man named Spencer Richardson was arrested in an unrelated case and wanted to provide information about both the Hall and Curry murders. According to the note, Richardson said that Lawrence killed Curry and that he also had information about the Hall murder.

110.    There is no documentation in either the Hall or Curry H Files that detectives conducted a formal interview with Richardson.

**H.    Community members attempt to remedy Sparks's wrongful arrest and prosecution, but Marano lies to internal affairs officers about the investigation.**

111.    In the almost two years between Sparks's arrest and his trial, his family and community members tried to persuade the defendant detectives that they had charged the wrong person.

112.    Sparks's family members continuously contacted Marano and Marano's supervisors regarding the investigation to inform them that Simmons was the true perpetrator and to provide them names and contact information of eyewitnesses to interview. The complaints they made ultimately led to PPD's internal affairs division ("IAD") opening an investigation.

113.    IAD investigators had further reason to suspect police wrongdoing in the Hall murder investigation as McShore had disclaimed the fabricated statement attributed to him at his earliest opportunity. He attended Sparks's preliminary hearing on January 31, 2007, despite not being asked to testify, and as the prosecutor at the hearing summarized McShore's false statement in response to a defense request for a lineup, McShore sat in the courtroom vigorously shaking his head. At the end of the hearing, McShore stated on the record that Sparks was innocent and the true perpetrator had been killed.

114.    On April 19, 2007, Marano gave a statement to an IAD lieutenant regarding the Hall investigation. Marano lied repeatedly in the interview, telling the investigator that Sparks was the only suspect known to the police. He denied that Sparks's mother and grandmother had provided detectives with any alternative suspects, witnesses, or assistance with the investigation,

and he stated that Simmons had never been identified by anyone as the perpetrator of the Hall homicide.

115.    These were demonstrable falsehoods and had the IAD lieutenant conducted even a cursory review of the homicide investigation file or the related investigation files, Marano's lies would have been readily apparent based on the multiple notes throughout the file and other files pointing to Simmons as the perpetrator and handwritten notes to Marano describing several phone calls from Sparks's mother providing names and contact information of witnesses to the shooting.

116.    The IAD lieutenant, however, conducted no such investigation, and, instead, credited Marano's statement as true without further inquiry. In doing so, he acted consistently with the widespread custom within PPD's IAD to accept detectives' statements as true without even minimally investigating their claims.

I.    **Without access to the withheld evidence, Sparks is convicted at trial and sentenced to life in prison.**

117.    Sparks waived his right to a jury and had a bench trial in the Philadelphia Court of Common Pleas on April 28, 2008.

118.    At the time of trial, Sparks did not have access to and was not aware of the numerous pieces of exculpatory evidence the defendant detectives had obtained throughout the Hall, Simmons, and Curry homicide investigations as well as the Clark and Crum nonfatal shooting investigations, including:

      a.    A 911 call made after Sparks's arrest stating that the "doer" was seen driving a gray car;

    b.   Handwritten notes prepared by the detectives investigating Hall's death documenting that at least four witnesses—Tyrik Hood, Tyrell Hood, Latisha Lowery, and Lakevia Parker—stated that Simmons shot Hall;

    c.   A handwritten note documenting that detectives had spoken with a witness, Thelma Thomas, who provided a motive for Simmons shooting Hall and the names of additional witnesses who told her Sparks was innocent;

    d.   Simmons's mother's statement to detectives after his death that she had received information tying her son to Hall's murder;

    e.   Detectives Hassel and Acerenza's interview of Jameel Crum in which Crum stated that Simmons shot Hall and was killed in retaliation for Hall's death;

    f.   Detective Grace's interview of Socrates Clark in which Clark stated Simmons was killed in retaliation for shooting Hall;

    g.   Detectives Grace and Hassel's interview of Nicholas Walker in which Walker stated that Simmons killed Hall;

    h.   Handwritten notes addressed to Detectives Marano and Williams describing Simmons and his brother Marquis Lawrence's connection to Hall's death, including one relaying a message about the brothers from Lieutenant Perry.

119.    Each of these items of evidence, as well as the information the defendant detectives had about the larger web of retaliatory shootings that followed Hall's murder, would have provided support for Sparks's theory at trial: that he had been wrongfully prosecuted and that Ivan Simmons was the true perpetrator of Hall's murder.

120.    No physical evidence was presented at trial inculpating Sparks.

121.    Kalishea and Markita Reddy testified for the prosecution, and their testimony was unreliable on its face. For example, Kalishea gave a version of the shooting that was inconsistent with her prior statement and preliminary hearing testimony, speculating for the first time on cross-examination that there must have been two people shooting at Hall, despite the conflicting physical evidence. She also admitted she made "a mistake" during her preliminary hearing testimony when she had said she saw Sparks running with Lawrence after the shooting. Markita testified that she saw Sparks arguing with Hall, which was inconsistent with Kalishea's testimony that Marquis Lawrence was the one who argued with Hall while Sparks was standing on the other side of the street.

122.    McShore was brought to court on a bench warrant. He reiterated that the statement Detectives Verrecchio and Mostovyk attributed to him the morning after the shooting was prewritten and fabricated. The prosecutor read the statement to him question by question, and McShore testified in response to each question that the detectives had invented the answers attributed to him.

123.    Consistent with their fabricated report and false representations to prosecutors, Lieutenant Perry and Detective Verrecchio both testified that McShore's statement and identification of Sparks as the perpetrator was accurate and reliable.

124.    Sparks presented one witness in his defense, Latisha Lowery, who testified that she was at the scene and that she saw Simmons shoot Hall. She testified, further, that at the time of the shooting she saw Sparks talking to two individuals named Tyrell and Natevia. She explained that she had not previously spoken to police because her mother did not want her to do so out of fear of retribution from Simmons.

23

125.     On May 1, 2008, based on the evidence defendants fabricated, and not having heard any of the significant exculpatory information that would have conclusively undermined the prosecution's case, the court found Sparks guilty of first-degree murder and related charges.

126.     On May 23, 2008, Sparks was given a mandatory sentence of life imprisonment. without parole.

> **J.     Additional witnesses speak out, and the Reddy sisters admit their statements implicating Sparks were false.**

127.     Sparks maintained his innocence throughout his prosecution. He continued to do so following his conviction and, for years, he challenged the conviction through numerous post-conviction filings in both state and federal court.

128.     In the months following Sparks's conviction, the defendant detectives continued to obtain and suppress evidence demonstrating his innocence.

129.     On October 10, 2008, the detectives investigating the Simmons murder wrote notes regarding another interview with Socrates Clark in which Clark confirmed Simmons shot Hall and further described the resulting string of retaliatory shootings. He also explained that Simmons and Nicholas Walker had been committing robberies together prior to Simmons's death.

130.     In 2014, Sparks began working with the Pennsylvania Innocence Project, whose investigator conducted a series of interviews with three eyewitnesses, two of whom the defendant detectives had failed to formally interview, Tyrell Hood, Shania McPherson, and Nael Reddy.

131.     All three witnesses provided information further proving what the defendant detectives had known for years, that Sparks was innocent:

a.  Hood, whom police knew was a potential eyewitness in 2006, explained that he was standing next to Sparks when the shooting began and that Sparks had no gun and was not shooting at anyone;

b.  McPherson restated what she told detectives in 2006, that she was with Markita and Kalishea Reddy inside the Chinese restaurant when the shooting took place, and further confirmed neither girl could have seen the things they testified to seeing because it was dark outside and brightly lit inside, the windows of the restaurant were dirty and hard to see through, and the girls were all huddled in the back of the restaurant far from the window;

c.  Nael Reddy, a cousin of Kalishea and Markita Reddy, explained that Kalishea's mother and Hall's mother were close friends, and they wanted someone to go to prison for Hall's death so they pressured Kalishea and Markita to make statements and testify against Sparks.

132.    Sparks's 2014 post-conviction petition based on these statements was denied without a hearing.

133.    In February 2020, a man named Kevin Hickenbothem provided a statement to the Pennsylvania Innocence Project explaining that he saw Simmons shoot Hall, that Sparks was merely present at the scene without a gun, and that he saw Sparks attempt to help Hall after the shooting.

134.    In December 2021, a man named Aubrey Simpson wrote an affidavit stating that Sparks was a few feet away from him during the shooting and that Sparks was not the shooter.

135.    Around the same time, both Markita and Kalishea Reddy admitted their post-incident police statements and trial testimony inculpating Sparks were false.

25

136.    After contacting Sparks's family in 2020 and stating that she wanted to tell the truth, in 2021, Markita Reddy signed an affidavit explaining that she never saw who shot Hall and that she said Sparks was the shooter only because her cousin, Kalishea, had said so and they were receiving intense pressure from Hall's associates to testify against Sparks.

137.    After also expressing through a family member that she too wanted to tell the truth, Kalishea Reddy spoke with Sparks's mother by phone and admitted that she did not see Sparks shoot Hall. Kalishea wept and apologized, explaining that Hall's family members had pressured her to say Sparks was the shooter. Because she was afraid of perjury charges, she told Sparks's mother that she would not provide a written statement.

**K.    Sparks gains access to several PPD investigation files containing buried exculpatory evidence and finally obtains relief.**

138.    On March 24, 2022, the DAO produced to Sparks's attorneys the Simmons H File. At the time the Hall H File could not be located.

139.    That Simmons file contained the extensive information described above documenting that Simmons was shot in retaliation for his killing Hall. This information, which had not been provided to the DAO or Sparks prior to trial, included:

  a.    Detectives Hassel and Acerenza's case summary document affirmatively linking the Simmons murder to the Hall murder;

  b.    Handwritten notes of an interview with Simmons's mother suggesting her son's involvement in the Hall shooting;

  c.    Detectives Hassel and Acerenza's interview with Jameel Crum in which Crum told them Simmons was killed in retaliation for Hall's death;

  d.    Detective Grace's interview with Socrates Clark, Hall's cousin, explaining that the escalating series of shootings detectives were investigating were

traced back to the fact that Simmons killed Hall and that Simmons was killed in retaliation for that murder;

    e.   Notes regarding the Hall murder including the name of the assigned detective, Marano, with the notation, "Ivan Simmons – involved"; and

    f.   Notes regarding Clark's 2008 statement, again specifying Simmons shot Hall.

140.    After review of these materials, the assistant district attorney who prosecuted Sparks at trial confirmed that he had not seen the documents in the Simmons H file before trial, that he considered them favorable to Sparks, and that he would have produced them to Sparks prior to trial if he had known of their existence.

141.    The DAO's Conviction Integrity Unit (CIU) began reviewing Sparks's conviction, and through investigation, located and produced the Hall H File, which contained further exculpatory evidence that had never been produced to the DAO or Sparks, including:

    a.   Handwritten notes with contact information for multiple eyewitnesses with whom defendant detectives had documented no formal interviews, and notations stating, "Ivan shot him" and "Simmons – shooter";

    b.   Handwritten notes of an interview with Thelma Thomas who provided a motive for Simmons to kill Hall and provided the name of another witness who had stated Sparks was innocent; and

    c.   The IAD investigator's interview with Detective Marano in which Marano falsely claimed that no one had identified Simmons as the shooter.

142.    The CIU also discovered and produced Nicholas Walker's statement to Detectives Grace and Hassel in which Walker confirmed Simmons shot Hall and Simmons was killed in retaliation. This statement was also withheld from the prosecution and Sparks prior to trial.

143.    The CIU then produced to Sparks's attorneys the H File from the Curry murder, which occurred shortly before the Hall murder. That file contained yet more withheld exculpatory evidence, including:

      a.   Ample evidence that Simmons, his brother Marquis Lawrence, and Nicholas Walker had killed Curry shortly before Hall was shot;

      b.   A phone message from Lieutenant Aisha Perry to Lieutenant Melvin Williams stating that Simmons's brother killed Curry and Simmons killed Hall.

      c.   A handwritten note documenting Simmons killed Hall; and

      d.   A handwritten note to Detectives Crystal Williams and Marano stating that a man named Spencer Richardson had information about Hall's murder.

144.    As part of their investigation, the CIU also requested that PPD's Firearm's Identification Unit ("FIU") perform a ballistics analysis comparing the Curry and Hall homicides, which resulted in the finding that the fired cartridge casings recovered from both shootings were fired in the same firearm.

145.    Sparks filed additional post-conviction petitions with each subsequent set of newly discovered evidence found in each produced H file.

146.    On July 24, 2023, the DAO conceded that Sparks was due relief based on the fact that exculpatory evidence was withheld from him.

147.    On November 6, 2023, the Philadelphia Court of Common Pleas vacated Sparks's conviction.

148.    The DAO moved to dismiss all charges against Sparks. The court granted the motion resulting in a nolle pros all charges.

149.    Sparks was released from prison after more than 17 years' wrongful incarceration.

L.  **The defendants' conduct is caused by the PPD Homicide Division's established history of unconstitutional practices and the City's deliberate indifference to those practices.**

150.    The unconstitutional conduct of the defendant detectives described above was directly and proximately caused by a long-established history of practices in the PPD in general and specifically in the PPD Homicide Division.

151.    For many years, dating back at least to the 1970s, and continuing through and beyond the time of the investigation of Gary Hall's murder, the City of Philadelphia had, in force and effect, a policy, practice or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain statements, fabricating inculpatory evidence, withholding exculpatory evidence, failing to investigate known exculpatory evidence, and otherwise failing to conduct constitutionally adequate investigations.

152.    These practices were well known to the City of Philadelphia and its policymakers as a result of newspaper investigations including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

153.    Various cases demonstrate that this misconduct was pervasive within the PPD prior to and around the time of the Hall murder investigation and Sparks's trial in 2008, and thereafter. The cases include the following:

       a.  **Matthew Connor**: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving

a life sentence, a non-profit organization persuaded the Philadelphia District
Attorney's Office to revisit the case. The prosecution then discovered that
police failed to turn over exculpatory evidence, including a recording of a call
with a prosecution witness that contradicted her trial testimony, and evidence
that police considered the victim's half-brother, who had a history of
assaulting young girls and was observed carrying an ice pick around the
apartment complex, as an alternative suspect. In February 1990, Connor was
granted a new trial, and the next month the charges were dismissed.

b. **Gerald Howell:** In late 1982 into the early months of 1983, Philadelphia
Police Detectives coerced witnesses into inculpating Howell in a murder that
was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a
teenager at the time, that they would arrest Parnell, the father of her child, for
the murder if she did not sign a statement inculpating Howell. PPD Detectives
also threatened two other teenage witnesses with arrest if they did not come to
court to testify against Howell, even though the police had reason to believe
that Parnell was the real shooter. Additionally, PPD Detectives suppressed
information given to them by the brother of the decedent that Parnell was the
shooter. Years later, Parnell confessed to the murder for which Howell had
been convicted. In 2022, the DAO conceded that the PPD had suppressed
exculpatory evidence. In 2023, a federal judge granted Howell's habeas
corpus petition and vacated his conviction. Howell was released in 2023 after
being imprisoned for four decades for a crime he did not commit.

c. **Bruce Murray and Gregory Holden:** In 1983, Murray and Holden were convicted of a 1980 murder based on PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements, and suppressing exculpatory evidence. Murray and Holden were exonerated in April 2023 and January 2024 respectively based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

d. **Alen Lee:** In September 1983, Alen Lee was arrested in connection with the murder of 25-year-old restaurant manager Jade Wong. The murder was committed by three Asian men who announced that they were gang members from New York City and who tried to extort Wong for money. Philadelphia detectives secured a conviction of Lee by fabricating an informant statement to implicate Lee, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, Philadelphia police failed to disclose evidence of the true perpetrators.

e. **Willie Stokes:** In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the

murder. For years, Lee continued to have contact with the investigating detectives, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

f. **Curtis Crosland:** In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives, including defendant Mangoni, knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU located

the referenced exculpatory information in police files. In 2021, a federal

district court accepted the CIU's concession that Crosland was entitled to

relief and was likely innocent, and, therefore, vacated the conviction.

g.  **Andrew Swainson:** PPD Homicide Division detectives based their 1988

arrest of Swainson on the testimony of a single witness who had been taken

into custody while running from the scene of the murder in blood-soaked

clothes. The witness provided a facially unbelievable narrative of the shooting

after PPD detectives coerced him into identifying Swainson as the perpetrator.

After this witness recanted his statements several times, PPD detectives

pressured a different vulnerable young witness to support his false claims at

trial. Based on this misconduct and the suppression of exculpatory evidence,

in June 2020, Swainson's conviction was vacated and all charges were

dismissed.

h.  **Pedro Alicea**: In 1989, after failing for four years to resolve a 1985 double

homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a

case against Pedro Alicea out of whole cloth. To build a false case against

Alicea, detectives disregarded significant evidence demonstrating that two

local drug dealers were responsible, and leaned on vulnerable individuals to

obtain false identifications of Alicea as the shooter. The officers pressured

Angel Fuentes, a longtime informant who had a close personal relationship

with the lead detective, and who was facing significant prison time on a

number of open charges, to endorse a fabricated statement identifying Alicea

as the shooter. They then coerced Ray Velez, who had himself been

implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

i.   **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

j.   **Ronald Johnson**: Following a 1990 homicide, PPD Homicide Division took nine different statements from two witnesses who had initially exculpated Johnson and coerced them until they agreed to inculpate him. Johnson spent 34 years in prison before the DAO located suppressed evidence of the coercion in police files. Based on this buried evidence of police misconduct, Johnson's conviction was vacated in March 2024.

k.   **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an

incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016). In 2024 an Eastern District of Pennsylvania jury found two investigating detectives liable for Dennis's wrongful conviction and awarded Dennis $16 million.

l.  **Anthony Wright**: Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

m.  **Troy Coulston:** In 1991, Coulston was convicted of a 1989 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable, teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, that actual perpetrator of the murder. Mr. Coulston's conviction was vacated in 2021 based on the discovery of previously suppressed exculpatory evidence.

n.  **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they

falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges *nolle prossed*, and he was released from prison after serving more than 25 years for a crime he did not commit.

o. **Chester Hollman:** PPD detectives framed Chester Hollman for a 1991 murder he did not commit. Detectives coerced a witness, Deirdre Jones, who had no knowledge of the crime, to provide a false statement implicating the innocent Hollman; they typed out a statement implicating Hollman, falsely attributed it to Jones, and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Hollman's innocence. In 2019, Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned.

p. **Willie Veasy:** Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

q.  **Percy St. George:** A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

r.  **Johnny Berry:** PPD homicide detectives arrested 16-year-old Johnny Berry for a 1994 robbery murder based on the testimony of an eyewitness who was in the company of the murder victim and the testimony of an alleged accomplice, Tauheed Lloyd. At trial, the eyewitness claimed that detectives had pressured her into identifying Berry and Berry was convicted based solely on Lloyd's testimony. Several years later, Lloyd acknowledged that he had lied about Berry. In 2019, the DAO agreed to vacate Berry's conviction, after which Berry learned that detectives had suppressed information regarding multiple witnesses who had heard Lloyd admit that he, not Berry, was the shooter. Berry's civil suit settled for $5.65 million.

s.  **Terrence Lewis**: PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and deliberately hiding key exculpatory evidence that would have demonstrated Lewis's innocence. In 2019, Lewis was exonerated after he spent 21 years wrongly imprisoned.

t. **John Miller**: In June 1997, Miller was arrested for the 1996 murder of
Anthony Mullen based on a statement PPD detectives obtained from alleged
witness David Williams. Williams recanted during a 1997 preliminary hearing
and at trial in 1998. Investigating detectives knew Williams's statement was
untrue as he had given them provably false information on other subjects, but
they failed to disclose their knowledge of this information undermining
Williams's credibility. They continued to withhold that information for years,
even after Williams confessed that he was the person who had committed the
murder. In 2019, a federal district court vacated Miller's conviction based on
its finding that investigating detectives had suppressed critical information
undermining the inculpatory evidence presented at trial, and the DAO
subsequently dismissed all charges, stating that Miller had "met his burden of
proving his innocence."

u. **Eugene Gilyard and Lance Felder**: In 1998, Gilyard and Felder were
arrested and subsequently convicted of the 1995 murder of Thomas Keal.
During a cold-case investigation more than two years after the crime, PPD
detectives fabricated and coerced witness identifications and statements and
buried exculpatory evidence in order to secure charges against Gilyard and
Felder. For example, after witness Keith Williams initially told detectives
Felder was not a person he had seen at the time of the crime, detectives
coerced Williams to identify Felder's photograph by visiting Williams's home
multiple times, cursing and shouting at him, pushing on his head while
pointing to Felder's photo. Similarly, after witness Patrick Harris told

detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated a report stating that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and Felder reached a settlement with the City for compensation for their wrongful convictions.

v.  **William Johnson:** In September 2005, PPD Homicide Division detectives arrested Johnson for the shooting of an off-duty Philadelphia police officer after he had solicited a sex worker. Detectives pressured two sex workers who had been in the area to identify Johnson and another man as the shooter. In 2023, after the CIU produced materials proving that at least one of the witnesses had been coerced to testify against Johnson, habeas relief was granted, and Johnson was released after 18 years' imprisonment.

w.  **Recco Ford**: In 2007, detectives acting on an unsubstantiated anonymous tip detained two juvenile witnesses without their parents' knowledge and pressured them to identify 16-year-old Recco Ford as the perpetrator of a murder that occurred at a playground in southwest Philadelphia. Ford spent three years in pre-trial detention before his trial where, based on the testimony of two teenaged girls who had seen the shooting and called 911 to report it and who confirmed that Ford was not the perpetrator, he was acquitted. Ford later sued the detectives who caused his prosecution, and the City of Philadelphia settled his lawsuit for several hundred thousand dollars.

x. **Steven Lazar**: Lazar was convicted of a 2007 murder as a result of PPD

Homicide Division Detectives, including defendant Verrecchio, fabricating

witness statements from vulnerable individuals and securing a false

confession by knowingly subjecting Lazar to more than 30 hours of

interrogation while he was undergoing severe opioid withdrawal. Lazar's

conviction was vacated in March 2023 based on the discovery of suppressed

evidence after he had spent approximately 16 years in prison.

154.    In addition to the above cases involving individuals wrongfully prosecuted due to

the misconduct of Philadelphia police detectives, through the early 2000s and 2010s, the City of

Philadelphia was aware of—and deliberately indifferent to—the rampant and criminal conduct of

homicide detective Philip Nordo, who engaged in a shocking pattern of sexually abusing

witnesses and grooming informants by providing them with sexual favors. The City had notice of

Nordo's conduct as early as 2005 but failed to fully investigate credible complaints about his

actions for more than a decade. In 2019, Nordo was arrested and charged with multiple sexual

offenses. He was later convicted and sentenced to 24 ½ to 49 years in prison. Following his

arrest, at least a dozen convictions obtained through Nordo's misconduct were vacated.

155.    The City's indifference to the misconduct that gave rise to the above-listed

wrongful convictions and misconduct has continued unabated through today. Public news

reporting documented that of over 41 cases resulting in exonerations between 2018 and 2025,

PPD detectives have conducted only limited investigation into a small number of those cases.

Instead of seeking to find the actual perpetrators of the violent crimes giving rise to these

prosecutions and instead of remedying unlawful police misconduct, the City has chosen inaction.

156.    As evidenced by the pervasive nature of the conduct and the continuing indifference of the City in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

157.    In particular, the defendant detectives responsible for Sparks's wrongful conviction have well-documented histories of serious, sometimes similar misconduct including, but not limited to, the following examples:

    a.  Defendant Marano has been found or alleged to have engaged in unlawful actions on multiple occasions, including: (1) the Pennsylvania Superior Court upheld a Court of Common Pleas finding that in 2008 Marano improperly continued interrogating a teenaged suspect without counsel or parents present after the teenager invoked his right to counsel, *Commonwealth v. Bland,* 2013 WL 11282814 at *2, 6 (Pa. Super. Feb. 5, 2013); (2) allegations that Marano caused the wrongful conviction of Rasean Malone by withholding evidence in the form of handwritten notes documenting alternative suspects in the 2013 investigation of the homicide of Tyrell Woodson.

    b.  Defendant Verrecchio has been found or alleged to have engaged in unlawful actions on multiple occasions, including: (1) filing an affidavit of probable cause to arrest Recco Ford based on statements he knew to be false and coerced as well as withholding from Ford exculpatory evidence, causing Ford's wrongful prosecution, *see supra* ¶ 153(w); (2) withholding exculpatory evidence from Steven Lazar, causing Lazar's wrongful conviction, *see supra* ¶

153(x); (3) coercing statements of witnesses for which he was investigated by PPD's internal affairs division in 2021, *Commonwealth v. Bagley,* 2023 WL 6842568 *2 (Pa. Super. Oct. 17, 2023); and (4) participating and/or acquiescing to coercive and violent interrogations leading to the wrongful conviction of Christopher Goodwin in 2011.

c.  Defendant Mangoni was alleged to have committed misconduct in multiple investigations resulting in wrongful convictions, including: (1) knowingly presenting false evidence from an unreliable source causing the wrongful conviction of Curtis Crosland, *see supra* ¶ 153(f); and (2) fabricating a false witness identification causing the wrongful conviction of Willie Veasy, *see supra* ¶ 153(p).

d.  Defendant Melvin Williams has been alleged to have supervised multiple wrongful arrests and convictions, including: (1) the wrongful conviction of Steven Lazar, *see supra* ¶ 153(x); and (2) the wrongful arrest of Aaron Harrison in 2015.

e.  Defendants Sloan, Hassel, Acerenza, and Grace were alleged to have participated in the wrongful arrest and prosecution in 2008 of Malik Marshall, whose civil lawsuit settled in 2010.

f.  Defendants Hassel and Acerenza were also alleged to have withheld evidence, and Hassel was alleged to have testified falsely at a preliminary hearing in the prosecution of Lionel Franks in 2010.

g.  Defendant Morton was alleged to have denied shooting victim Jeremiah Coates insulin in an attempt to coerce an identification statement in 2012.

Coates's civil lawsuit settled for $200,000.

h. Defendant Perry was fired from the PPD in 2012, convicted of theft charges in 2014, and sentenced to serve six to 23 months in prison.

158. At the time of the investigation of the Hall murder and prosecution of Sparks between 2006 and 2008, the PPD had a policy, practice, or custom of concealing and withholding exculpatory evidence, creating fabricated evidence, and initiating prosecutions without probable cause.

159. These practices, as exemplified by the investigations in Sparks's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia. Those practices date back for decades.

160. On three separate occasions in the 1980s, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in such practices. See *Cliett v. City of Philadelphia*, No. 85-cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals through drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in the Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, No. 88-cv-2264 (E.D. Pa. 1988) (enjoining stops, detentions, and searches of Black men during investigation of the "Center City Stalker").

161. Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of

persons, due to the deliberate indifference of the City of Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

162.    These systemic and unconstitutional practices and customs were addressed only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

163.    As a result of this pattern of police misconduct, and in light of evidence showing substantial racial bias in PPD practices, the City of Philadelphia entered into a settlement agreement requiring wide ranging reforms in the PPD, and in particular providing for specific limitations on PPD investigative practices and policies. See *NAACP v. City of Philadelphia*, No. 96-cv-6045.

164.    In the early 2000s, PPD homicide detectives had a practice of unlawfully detaining people whom they believed to be witnesses with information about homicides. Detectives would hold witnesses in custody for prolonged periods—sometimes for days—and instruct them that they would only be allowed to leave if they provided a signed statement implicating the detectives' chosen suspect. This practice continued unabated for years until publicity involving unlawful detention of witnesses led to the issuance of a new directive in 2014 instructing PPD homicide detectives for the first time that witnesses had to be informed that they were not required to speak with detectives.

165.    In summary, at the time of the investigation and prosecution of Sparks, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

a.  Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures;

b.  Using these practices to target people of color for unlawful treatment;

c.  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violated generally accepted police practices;

d.  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

e.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

f.  Failing to properly sanction or discipline PPD officers who were aware of and concealed and/or aided and abetted violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Sparks.

45

166.    At the time of the investigation of the Hall murder and the prosecution of Sparks, and for many years before and thereafter, the City of Philadelphia was deliberately indifferent to the need to train, supervise, and discipline police officers. Specifically, the Internal Affairs Division (IAD) of the PPD failed to provide an internal disciplinary mechanism that imposed meaningful disciplinary and remedial actions in the following respects:

a.   Excessive and chronic delays in resolving disciplinary complaints;

b.   A lack of consistent, rational, and meaningful disciplinary and remedial actions;

c.   A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.   A failure to establish an internal investigatory process that was not arbitrary and inconsistent;

e.   Imposing incident-based, rather than progressive discipline, resulting in the failure to penalize repeat violators;

f.   Failure to institute necessary training and supervision for IAD investigators in order to ensure proper investigations;

g.   Investigative practices which adopted a default position that officers had not violated any rules and reflexively credited their accounts without further investigation;

h.   Failing to institute any quality control measures to ensure valid IAD findings and conclusions;

i.   Failing to adopt an effective early warning system to identify, track, and monitor officers with significant disciplinary histories;

    j.   Failing to interview available eyewitnesses to incidents involving citizen complaints of misconduct; and

    k.   Failing to acknowledge the disproportionate and extreme use of violence and other improper conduct used by police officers.

167.    The deficiencies within PPD's IAD specifically caused Sparks's wrongful conviction as the IAD was informed that Detective Marano was knowingly pursuing an innocent person for prosecution in the Hall murder and took no meaningful action. In accordance with the above described flaws, the IAD officers failed to properly investigate the allegations in this case, crediting Marano's false statement without any further inquiry, when even a cursory review of the Hall H file would have alerted the IAD to the need to take further action.

168.    Given all of the above, the City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Sparks's constitutional rights.

**M.    Sparks suffered, and continues to suffer, immense damages.**

169.    The defendant detectives' unlawful conduct outlined above caused Sparks to be improperly arrested, prosecuted, and imprisoned for more than 17 years for a crime he did not commit.

170.    As a direct and proximate result of the defendant detectives' actions and omissions, Sparks sustained injuries and damages, including loss of his freedom; loss of many of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal

fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

171.    As a direct and proximate result of the defendant detectives' actions and omissions, Sparks was deprived of his familial relationships, including time with his parents, siblings, and extended family, particularly his cousin and father who both died while he was in custody.

172.    At the time he was arrested, Sparks's girlfriend was pregnant, and he did not meet his daughter outside of a prison until his release in 2023, at which point his daughter was 18 years old.

173.    As a direct and proximate result of the defendant detectives' actions and omissions, Sparks sustained economic injuries and damages, including loss of income and loss of career opportunities, as he was incarcerated during many of the most productive years of his adult life.

174.    As a direct and proximate result of the defendant detectives' actions and omissions, Sparks sustained and continues to suffer damage to his reputation.

175.    As a direct and proximate result of the defendant detectives' actions and omissions, Sparks sustained and continues to suffer physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

176.    As a direct and proximate result of the defendant detectives' actions and omissions, Sparks sustained mental health injuries and damages, including adverse psychological symptoms, mental anguish, and emotional distress, which he continues to experience to this day.

V.      **Causes of Action**

177.    Plaintiff David Sparks brings the below causes of actions against the City of

Philadelphia and the following who are collectively identified as "individual defendants":

Donald Marano, James Sloan, Crystal Williams, Aisha Perry, John Verrecchio, Det. Mostovyk,

Dominic Mangoni, Joseph Bamberski, John Newcomb, Levi Morton, Stephen Grace, Robert

Hassel, Michael Acerenza, Melvin Williams.

**Count 1**
**Plaintiff v. Individual Defendants**
**Fabrication of Evidence**

178.    The individual defendants fabricated evidence in support of a prosecution against

Sparks and/or aided and abetted the introduction of fabricated evidence. The fabrication of this

evidence caused Sparks's wrongful conviction and, therefore, violated his right to a fair trial and

due process of law under the Fourteenth Amendment to the U.S. Constitution.

**Count 2**
**Plaintiff v. Individual Defendants**
**Malicious Prosecution**

179.    The individual defendants caused the initiation of a prosecution against Sparks

without probable cause and with malice. The criminal charges they caused to issue against Mr.

Sparks were terminated favorably to Sparks. These defendants, therefore, subjected Sparks to a

malicious prosecution in violation of the Fourth and/or Fourteenth Amendments to the U.S.

Constitution.

**Count 3**
**Plaintiff v. Individual Defendants**
**Deliberate Suppression of Exculpatory Evidence and Violation of *Brady v. Maryland***

180.    By intentionally concealing and deliberately suppressing exculpatory evidence,

the individual defendants violated Sparks's right to due process of law under the Fourteenth

Amendment to the U.S. Constitution, and, additionally, the suppression of this evidence violated

Sparks's rights under *Brady v. Maryland*.

### Count 4
### Plaintiff v. Defendant City of Philadelphia
### Municipal Liability

181.    Defendant City of Philadelphia, with deliberate indifference, adopted and/or

acquiesced in policies, practices, and customs which were a moving force in the violation of

Sparks's constitutional rights, and, further, defendant City of Philadelphia, with deliberate

indifference, failed to properly train, supervise, and/or discipline officers and, as such, was a

moving force in the violations of Sparks's constitutional rights.

### Count 5
### Plaintiff v. Individual Defendants
### Supplemental Claim – Malicious Prosecution

182.    The individual defendants as described above, caused the malicious prosecution

of Sparks, and, as such, committed the tort of malicious prosecution under the laws of the

Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff David Sparks respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to the individual defendants;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ *Grace Harris*
Jonathan H. Feinberg
ID No. 88227
Grace Harris
ID No. 328968
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400

Emma Freudenberger*
Amelia Green*
Katrina Rogachevsky
NEUFELD  SCHECK BRUSTIN
  HOFFMANN & FREUDENBERGER LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

*Counsel for Plaintiff*

* *Pro Hac Vice* application forthcoming